UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------- x
                              :

UNITED STATES OF AMERICA,      :
                              :

           - v. -          :           19 Cr. 547 (CS)
                              :

MEHDI MOSLEM, and        :
SAAED MOSLEM,           :
                              :

             Defendants.     :
------------------------------------------------- x

## THE GOVERNMENT'S AMENDED MOTIONS *IN LIMINE*

AUDREY STRAUSS
United States Attorney
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

Daniel Loss
Nicholas S. Bradley
James McMahon
Assistant United States Attorneys
- *Of Counsel* –

## Table of Contents

I.   Preliminary Statement ........................................................................... 1

II.  Background ............................................................................................. 2

     A.   The Charges Against Defendants Medhi Moslem and Saaed
          Moslem ......................................................................................... 2

     B.   The Charged Conspiracy to Defraud the IRS ............................. 3

     C.   The Charged Bank Fraud Conspiracy, False Statements to
          Lenders, Bank Fraud, and Aggravated Identity Theft Offenses .......... 7

     D.   The Charged Bankruptcy Offenses ........................................... 10

III. Argument ............................................................................................. 12

     A.   The Court Should Admit Proof of Certain Bad Acts by the
          Defendants ................................................................................. 12

          1.   Applicable Law ................................................................ 13

          2.   Discussion ....................................................................... 16

     B.   The Court Should Preclude the Defendants' Alleged Advice-of-
          Accountant Defense ................................................................... 29

     C.   The Court Should Exclude Evidence of Unclaimed Expenses of
          the Defendants .......................................................................... 31

     D.   The Court Should Exclude Evidence Regarding Any Alleged
          Lack of Loss on the Fraudulent Loans ..................................... 33

     E.   The Court Should Admit Statements by the Defendants' Agents ....... 37

     F.   The Court Should Exclude After-the-Fact Appraisals as
          Evidence of State of Mind ......................................................... 38

     G.   The Court Should Admit Defendants' Statements Regarding the
          Value of their Real Estate Assets ............................................. 39

     H.   The Defendants Should Be Required to Produce Reciprocal
          Discovery ................................................................................... 40

## I.    Preliminary Statement

The Government respectfully submits the following amended motions *in limine* in advance of the trial of Mehdi Moslem and Saaed Moslem (the "defendants") scheduled to begin on May 17, 2021.[1] As set forth below, the Government seeks pretrial rulings from the Court to:

(1) allow evidence of various acts by the defendants as direct evidence of the charged offenses or under Federal Rule of Evidence 404(b);

(2) preclude the defendants' alleged advice of accountant defense;

(3) preclude evidence concerning unclaimed business expense deductions;

(4) preclude evidence regarding an alleged lack of loss by, or repayment to, the victim lenders;

(5) admit evidence of statements by the defendants' agents;

(6) exclude evidence of after-the-fact appraisals by the defendants as evidence of their state of mind; and

(7) admit the defendants' statements regarding the value of their real estate assets. The Government also respectfully requests that the Court order the defendants to comply with their reciprocal discovery obligations under Federal Rule of Criminal Procedure 16(b).

---

[1] Pursuant to the Government's letter to the Court dated April 1, 2021, the Government withdrew its original motions *in limine* filed on March 29, 2021. (Dkt. 76).

## II.     Background

### A.     The Charges Against Defendants Medhi Moslem and Saaed Moslem

On March 22, 2021, a Grand Jury in this district returned the Superseding Indictment (the "Indictment") in this case, numbered S1 19 Cr. 547 (CS), charging Exclusive Motors Sports owners Mehdi Moslem and Saaed Moslem with, among other things, conspiring to defraud the Internal Revenue Service ("IRS") and to commit bank fraud pursuant to long-running schemes that involved the wholesale fabrication of financial information and the falsification of tax returns and other documents.  In an effort to impede the IRS and dodge their creditors, the defendants told one story about their financial condition to the IRS (and in Saaed Moslem's case, the bankruptcy court), while simultaneously telling a very different story when pitching their purported creditworthiness to prospective lenders.  As the evidence at trial will show, whether providing information to the IRS or to financial institutions, the common thread to the defendants' conduct was deception.

Count One of the Indictment charges that from at least in or about 2009 through in or about 2018, Mehdi Moslem, Saaed Moslem, and CC-1 conspired to defraud the IRS, in violation of 18 U.S.C. § 371.  Count Two of the Indictment charges that, from at least in or about 2011 through in or about 2019, Mehdi Moslem, Saaed Moslem, and CC-1 conspired to commit bank fraud, in violation of 18 U.S.C. § 1349.  Counts Three and Four charge Saaed Moslem with making false statements to Bank of America and Melrose Credit Union, respectively, in violation of 18 U.S.C. § 1014.

Count Five charges Saaed Moslem with committing bank fraud, in violation of 18 U.S.C. §§ 1344 and 2. Count Six charges Saaed Moslem with fraudulently transferring and concealing assets and making false declarations and oaths in connection with a bankruptcy case, in violation of 18 U.S.C. §§ 152(1), (2), (3), and (7) and 2. Finally, Count Seven charges Saaed Moslem with aggravated identity theft, in violation of 18 U.S.C. § 1028A.

### B. The Charged Conspiracy to Defraud the IRS

The evidence at trial will show that in or about 2007, Saaed Moslem began operating Exclusive Motor Sports ("Exclusive"), a car dealership based in Central Valley, New York. In or about February 2010, Saaed Moslem, Mehdi Moslem, and a third individual ("Individual-1") hired an accountant in Orange County, New York ("Accountant-1") to prepare a 2009 U.S. Individual Tax Return Form 1040 for Saaed Moslem. Based on information provided by the defendants, the 2009 Form 1040 and accompanying Schedule C prepared by Accountant-1 (the "First 2009 Return") showed approximately $187,842 of business income from Exclusive, total income of the same amount, and total tax of $59,666. Accountant-1 reviewed the First 2009 Return, including these amounts, with the defendants. Mehdi Moslem asked Accountant-1, in substance and in part, to lower the profits reported on the First 2009 Return so that Saaed Moslem would not have to pay as much in taxes. After Accountant-1 declined, Saaed Moslem did not authorize Accountant-1 to file the First

2009 Return. Instead, Saaed Moslem hired a different tax preparer based in Rockland County ("CC-1") to prepare his 2009 tax return.[2]

In or about early 2010, CC-1 prepared a draft 2009 Form 1040 and Schedule C for Saaed Moslem (the "Second 2009 Return") reflecting similar income and tax amounts as the First 2009 Return prepared by Accountant-1. Saaed Moslem did not file, or authorize CC-1 to file, the Second 2009 Return. Saaed Moslem's 2009 Form 1040 filed with the IRS (the "Third 2009 Return") reported an adjusted gross income of approximately $36,961.[3] Saaed Moslem stated when applying for loans in 2010 and 2011 that his adjusted gross income for 2009 was substantially higher; *i.e.*, between $46,960 and $273,160 depending on the application.[4]

For several tax years during the charged conspiracy, the defendants caused Exclusive to file U.S. Partnership Tax Return Forms 1065. Although partnerships do not pay taxes in their own right, the income reported in Exclusive's Form 1065

_____

[2] Since in or about October 2012, CC-1 has been cooperating with the Government in hopes of receiving leniency at sentencing. CC-1 pled guilty in or about July 2019 to conspiring with the defendants to defraud the IRS and to committing bank fraud with the defendants, among other offenses.

[3] This information is based on an IRS Account Transcript corresponding to Saaed Moslem's filed 2009 Form 1040. The Government has requested that the IRS provide a copy of the actual return as expeditiously as possible.

[4] The Government intends to introduce evidence of tax returns submitted to financial institutions, but not filed with the IRS, as evidence of both the conspiracy to defraud the IRS charged in Count One and the bank fraud-related offenses charged in Counts Two through Five.

"flowed through" to Mehdi Moslem's and Saaed Moslem's personal tax returns, as owners of Exclusive.  For at least some tax years, Saaed Moslem and Mehdi Moslem agreed to have CC-1 prepare tax returns intended to falsely decrease their tax obligations by falsely inflating Exclusive's "cost of goods sold," which is a deductible business expense calculated, in part, by subtracting the cost of a business's year-end inventory from the sum of its beginning inventory and purchases during the year.  As a result, all else equal, reducing the ending inventory reported on a Form 1065 will appear to increase the cost of goods sold, thereby increasing deductions, decreasing net income, and ultimately decreasing the amount of tax due for the owners.

Some examples of the defendants' false deflation of Exclusive's ending inventory and profit for purposes of deceiving the IRS are set forth below:

- **2010 Tax Year**:  Exclusive's 2010 Form 1065 filed with the IRS in or about April 2011 reflected a year-end inventory of only approximately $665,761, which was substantially less than the amount reflected in a company balance sheet dated in or about December 2010.[5]

- **2012 Tax Year:** On or about July 23, 2013, Saaed Moslem wrote an email to CC-1 admitting that "as of Dec 31st 2012 we had about 1 million in inventory."  However, after the defendants approved of CC-1 falsely lowering that inventory amount for tax purposes, CC-1 prepared a 2012 Form 1065 for Exclusive reflecting an ending inventory of only $578,333.  The 2012 Form 1065 was not filed with the IRS, but was used to calculate the taxable income that flowed through to the 2012 Forms 1040 for Mehdi Moslem and Saaed Moslem that the defendants caused

_____

[5] The Government stated in its opposition to the defendants' pretrial motions that it did not, at that time, intend to argue that the defendants understated Exclusive's ending inventory for 2010.  Based on the development and analysis of additional evidence, the Government now expects the evidence at trial to show that the defendants falsely deflated Exclusive's ending inventory for 2010.

to be filed, thereby reducing their tax obligations.

- **2014 Tax Year:** On or about February 9, 2016, during a consensually recorded conversation, the defendants directed CC-1, in substance and in part, to reduce Exclusive's ending inventory for 2014 from approximately $650,000 to approximately $500,000. At the defendants' direction, the 2014 Form 1065 for Exclusive filed with the IRS reflected a falsely depressed ending inventory of $503,263, thereby reducing the tax obligation reported in Mehdi Moslem's 2014 Form 1040 filed with the IRS.[6]

- **2015 Tax Year:** On or about October 26, 2016, during a consensually recorded conversation, the defendants directed CC-1, in substance and in part, to falsely lower Exclusive's profit in order to reduce the amount of tax Mehdi Moslem would owe from approximately $80,000 to approximately $1,500. Consistent with the defendants' instruction, Mehdi Moslem's 2015 Form 1040 filed with the IRS reflected total tax of $1,573, based in part on falsely lowering the ending inventory reported in Exclusive's 2015 Form 1065.

- **2016 Tax Year:** On or about August 13, 2018, during a consensually recorded conversation, Mehdi Moslem approved falsely lowering Exclusive's ending inventory in order to decrease Exclusive's profit for reported to the IRS for 2016 by approximately $200,000 and thereby decrease his tax obligation from approximately $80,000 to approximately $5,000. CC-1 thus reduced the ending inventory in Exclusive's 2016 Form 1065 filed with the IRS from $945,672 to $745,672.

Saaed Moslem claimed to give up his ownership stake in Exclusive effective January 2014. The evidence at trial will show that from 2014 through 2017, Saaed Moslem received hundreds of thousands of dollars of compensation from Exclusive in

---

[6] As discussed below, Saaed Moslem ostensibly transferred his ownership stake in Exclusive to his father effective January 1, 2014, and Exclusive became a partnership between Mehdi Moslem and Individual-1. As a result, Exclusive's income for the 2014-2016 tax years did not flow through to Saaed Moslem's Forms 1040.

various forms, including checks made out to "cash" and the payment of personal expenses. For example, the Government expects witness testimony, financial ledgers, and other evidence to show that a substantial portion of approximately $287,040 reported as commissions on Exclusive's 2015 Form 1065, $226,448 reported as commissions on Exclusive's 2016 Form 1065, and $157,196 reported as commissions on Exclusive's 2017 Form 1065 represented compensation to Saaed Moslem. However, Saaed Moslem did not report such income on his Forms 1040 filed with the IRS, which reflected only $15,570 of income in 2015 and $15,675 in 2016. Saaed Moslem failed to file a Form 1040 for 2017.

### C. The Charged Bank Fraud Conspiracy, False Statements to Lenders, Bank Fraud, and Aggravated Identity Theft Offenses

While falsely presenting one picture of their financial condition to the IRS, the defendants presented a very different, but equally false portrait to financial institutions when seeking financing. The evidence at trial will show that from in or about 2011 through 2019, the defendants fraudulently sought and obtained several loans for Exclusive and Exclusive's customers, and that, as charged in Counts Three through Five, Saaed Moslem made additional false statements to lenders in mortgage applications in 2010, 2013, and 2019. With the assistance of CC-1, the defendants falsely inflated their income and net worth, which were material factors to the defendants' lenders because the defendants personally guaranteed repayment of several loans. As illustrative examples, the Government expects the evidence at trial

to show that the defendants falsely inflated the following assets in support of their loan applications:

- <u>Pine Bush Property</u>:  From approximately 2010 through 2013, Saaed Moslem told numerous prospective lenders that he owned a 25-acre property in Pine Bush, New York (the "Pine Bush Property") worth between approximately $1 million and $1.2 million.  In fact, Saaed Moslem purchased the Pine Bush Property in 2010 for only $425,000, received an appraisal that year for the same amount, and admitted in various other documents between 2013 and 2015 that it was worth between only $250,000 and $550,000.

- <u>Middletown Property</u>:  From approximately 2010 through 2013, Saaed Moslem told multiple prospective lenders that he owned a property in Middletown, New York (the "Middletown Property") worth between approximately $350,000 and $390,000.  In fact, after Saaed Moslem purchased the Middletown Property for $230,000 in 2005, it was destroyed in a fire in 2006, reducing its value because Saaed Moslem's homeowner's insurance policy denied his claim for property damage in 2007.  When filing for bankruptcy in January 2015, Saaed Moslem admitted that the Middletown Property was worth only $50,000.

- <u>Central Valley Property</u>:  In 2011, Mehdi Moslem told prospective lenders that the residence he owned in Central Valley, New York (the "Central Valley Property") was worth approximately $3.2 million.  In fact, Mehdi Moslem admitted in other documents between 2010 and 2012 that the Central Valley Property was worth between only approximately $1.6 million and $1.85 million.

In connection with their loan applications, the defendants also submitted putative tax returns that, unbeknownst to the financial institutions, were not filed with the IRS and differed materially from the filed returns.  For example, the Government expects the evidence at trial to show the following:

- In or about July 2010 – just three months after filing his 2009 Form 1040 with the IRS reflecting only $36,961 of adjusted gross income – Saaed Moslem submitted a fraudulent mortgage application to Bank of America for the purchase of the Pine Bush Property.  In support of the

application, Saaed Moslem submitted a fabricated 2009 Form 1040 (the "Fourth 2009 Return") that was never filed with the IRS, but which reported adjusted gross income of approximately $273,160.

- In or about December 2010, Saaed Moslem, on behalf of Exclusive, submitted an application to Hudson Valley Federal Credit Union ("Hudson Valley") for participation in Hudson Valley's Indirect Lending Network, pursuant to which Exclusive would be able to submit loan applications for its customers. In support of the application, Saaed Moslem submitted the same fabricated Fourth 2009 Return that he previously provided to Bank of America.

- In or about April 2011, Saaed Moslem and Mehdi Moslem, with the assistance of CC-1, submitted an application to Hudson Valley for a $1.5 million commercial mortgage for Exclusive, In support of the application, in or about May 2011, the defendants submitted a purported 2009 Form 1065 for Exclusive (the "Fifth 2009 Return") through CC-1 that showed ordinary business income of $187,842, substantially more than the amount reflected in a 2009 Form 1065 filed with the IRS,[7] but less than the fraudulent Fourth 2009 Return previously submitted to Hudson Valley and Bank of America. When Hudson Valley asked Saaed Moslem about discrepancies between the Fourth 2009 Return and the Fifth 2009 Return, Saaed Moslem asked, in substance and in part, how much his tax returns need to show in order to be approved for the loan. Saaed Moslem also provided a false explanation to Hudson Valley that blamed an accountant for confusing different entities in relation to the Fourth 2009 Return.

- In or about 2011, Saaed Moslem and Mehdi Moslem submitted an application to Riverside Bank in support of a $1.1 million commercial mortgage for Exclusive. In support of the application, Saaed Moslem caused the submission of a purported 2009 Form 1040 (the "Sixth 2009 Return") that showed Saaed Moslem's total income as $46,960, substantially more than the Third 2009 Return filed with the IRS, but substantially less than the fraudulent Fourth 2009 Return previously submitted to Hudson Valley and Bank of America.

---

[7] This is based an IRS transcript for Exclusive's 2009 Form 1065 obtained by the Government this week showing $147,842 of ordinary income. The Government is seeking to obtain a copy of that return from the IRS.

- From in or about November 2017 through in or about December 2018, the defendants submitted a purported 2016 Form 1065 for Exclusive and 2016 Form 1040 for Mehdi Moslem to Walden Bank and Noah Bank in support of loan applications for Exclusive. These returns were not filed with the IRS and reflected materially higher income than the filed returns.

- From in or about February to March 2019, Saaed Moslem submitted a fabricated 2017 Form 1040 for a customer of Exclusive ("Customer-1") to Mid-Hudson Valley Federal Credit Union in support of a car loan application, without Customer-1's knowledge or permission. The fabricated return – which contained Customer-1's personal identifying information including her name, social security number, phone number, and forged signature – falsely stated that Customer-1's total income in 2017 was $52,635.[8] Saaed Moslem knew that the fabricated return falsely inflated Customer-1's income because he had previously received her actual tax return, which reported total income of only -$991.

### D. The Charged Bankruptcy Offenses

While falsely touting his income and assets to financial institutions when seeking loans, the evidence at trial will show that Saaed Moslem sought to conceal his actual assets from some of those same institutions and other creditors in connection with a chapter 7 personal bankruptcy filing in 2015.

By way of background, in March 2015, Saaed Moslem admitted to CC-1 in a consensually recorded phone call that the reason he filed for bankruptcy in January 2015 was to "get rid of a mortgage" on the Middletown Property. As noted above, the Middletown Property was destroyed in a fire in October 2006. While Saaed Moslem submitted an insurance claim for property damage, his homeowner's insurance

---

[8] Saaed Moslem's possession and transfer of such information forms the basis of the aggravated identity theft offense charged in Count Seven of the Indictment.

company denied the claim in September 2007 due to material misrepresentations in his application for the policy regarding the occupancy of the Middletown Property. In 2011, Judge Scheindlin in this District granted the insurer's motion for summary judgment rescinding Saaed Moslem's homeowner's policy due to those false statements. *See Vermont Mutual Ins. Co. v. Saaed Moslem*, No. 07 Civ. 7962 (SAS), 2011 WL 2893627 (S.D.N.Y. 2011). By the time of Saaed Moslem's bankruptcy petition in January 2015, his mortgage on the Middletown Property was under water with the outstanding debt greater than the property's market value.

Nevertheless, at the time of his bankruptcy petition, Saaed Moslem earned substantial income and owned significant assets including a number of other real estate properties and his then 10% ownership stake in Exclusive. In order to hide his ownership of Exclusive from creditors, on or about March 30, 2015, Saaed Moslem directed CC-1 to "totally remove" him from the company in his 2014 tax return. When asked why, Saaed Moslem stated, "because I had to file for bankruptcy to get rid of a mortgage." Saaed Moslem further directed CC-1 to "put .that . . . January 1, 2014, I signed the company over to [Mehdi Moslem] basically." But rather than disclose the transfer of his ownership stake in Exclusive in the bankruptcy proceedings as required, Saaed Moslem falsely denied, under penalty of perjury in his bankruptcy petition and under oath during an April 2015 hearing before the bankruptcy trustee, having made any property transfers during the preceding two years. Saaed Moslem also made other false statements in the bankruptcy case, including, among other

things, falsely denying under oath owning any real estate properties beyond those disclosed his petition, thereby concealing his substantial ownership stake in three properties in Cornwall, New York. The bankruptcy case resulted in the discharge of approximately $509,062 of unsecured debt.

## III. Argument

### A. The Court Should Admit Proof of Certain Bad Acts by the Defendants

The Government intends to offer evidence during its case-in-chief at trial concerning the following fraudulent acts by either or both of defendants Mehdi Moslem and Saaed Moslem: (a) Saaed Moslem's fraudulent loan application to Hudson Valley in 2010; (b) Saaed Moslem's fraudulent application for a homeowner's insurance policy for the Middletown Property in 2006; (c) the defendants' fraudulent conduct in regard to uncharged bank loans during the period of the charged bank fraud conspiracy; (d) the defendants' underreporting of income in tax returns filed with the New York State Department of Taxation and Finance during the charged conspiracy to defraud the IRS; (e) the defendants' failure to file personal and corporate tax returns prior and during the charged conspiracy to defraud the IRS; (f) Saaed Moslem's efforts to underreport his income in connection with a 2018 bankruptcy case; and (g) Saaed Moslem's participation in the preparation and submission of fraudulent car loan applications for customers For the reasons that follow, evidence of all of these acts are highly probative and admissible as direct proof of the charged offenses, or for purposes authorized by Federal Rule of Evidence

404(b); any resulting prejudice does not substantially outweigh the significant probative value of this evidence; and any such prejudice can be adequately minimized through appropriate limiting instructions to the jury. Accordingly, all of this evidence should be admitted at trial.

### 1. Applicable Law

Under Rule 402 of the Federal Rules of Evidence, "[a]ll relevant evidence is admissible" at trial unless its admission is contrary to the United States Constitution, a federal statute, another Federal Rule of Evidence, or other rules proscribed by the United States Supreme Court. Federal Rule of Evidence 401 defines "relevant evidence" as evidence having "any tendency to make a fact more or less probable than it would be without the evidence" where "the fact is of consequence in determining the action." Fed. R. Evid. 401. Direct evidence is "not confined to that which directly establishes an element of the crime." *United States* v. *Gonzalez*, 110 F.3d 941, 942 (2d Cir. 1997). Rather, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.*

Under Rule 404(b) of the Federal Rules of Evidence, evidence of uncharged crimes, wrongs, or other acts by a defendant may be admitted for purposes other than proving the defendant's propensity to commit crimes, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b). The Second Circuit has long followed "an inclusionary

approach to evaluating Rule 404(b) evidence, which allows evidence to be received at trial for any purpose other than to attempt to demonstrate the defendant's criminal propensity." *United States* v. *Edwards*, 342 F.3d 168, 176 (2d Cir. 2003) (internal quotation marks and citation omitted). Under Rule 404(b), it is well settled that "other acts" evidence is admissible so long as the evidence: (1) is advanced for a proper purpose; (2) is relevant to the crimes for which the defendant is on trial; and (3) has probative value that is not substantially outweighed by any unfair prejudicial effect. *See United States* v. *Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States* v. *LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004). If requested, the admission of such evidence must be accompanied by an appropriate limiting instruction to the jury. *See United States* v. *Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993).

Rule 404(b) does not govern all evidence that can be characterized as "other acts" proof. When determining whether Rule 404(b) governs the admissibility of particular evidence, the Second Circuit has cautioned that relevant evidence of a crime is not limited to "that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 941. In keeping with that principle, "other acts" evidence can constitute direct evidence and, in that case, is not subject to analysis under Rule 404(b). *See, e.g., United States* v. *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000). For example, where, as here, a defendant is charged with conspiracy, "uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States* v. *Baez*, 349 F.3d 90, 93 (2d Cir. 2003) (quotation marks and citation omitted). Furthermore, it is well established that

"other acts" evidence is admissible as direct proof of the crimes charged and not considered Rule 404(b) evidence if it (i) "arose out of the same transaction or series of transactions as the charged offense," (ii) "is inextricably intertwined with the evidence regarding the charged offense," or (iii) "is necessary to complete the story of the crime on trial." *Carboni*, 204 F.3d at 44 (quotation marks and citation omitted).

Regardless of whether the evidence is admitted as direct evidence or under Rule 404(b), "other acts" evidence is, like all evidence, excludable under Federal Rule of Evidence 403 if its probative value is substantially outweighed by the danger of unfair prejudice. Rule 403 authorizes the exclusion of relevant evidence only if its "probative value is *substantially outweighed* by the danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added). All evidence of guilt is, of course, prejudicial, in the sense of disadvantaging the defense, but that is not the same as being "unfairly" prejudicial under Rule 403. *See Costantino* v. *Herzog*, 203 F.3d 164, 174 (2d Cir. 2000). As the Second Circuit has stated, "*all* evidence incriminating a defendant is, in one sense of the term, 'prejudicial' to him: that is, it does harm to him" and in "that sense, the more pertinent evidence is, the more prejudicial it is," but "[w]hat 'prejudice' as used in Rule 403 means is that the admission is, as the rule itself literally requires, 'unfair' rather than 'harmful.'" *United States* v. *Jimenez*, 789 F.2d 167, 171 (2d Cir. 1986) (emphasis in original). Evidence is *unfairly* prejudicial "only when it tends to have some adverse effect upon

a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States* v. *Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial. *See United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990).

The Second Circuit reviews the evidentiary rulings of a district court for abuse of discretion and reverses only in cases involving "manifest error." *See United States* v. *Miller*, 626 F.3d 682, 688 (2d Cir. 2010).

## 2. Discussion

### a. Evidence of Saaed Moslem's 2010 Loan Application to Hudson Valley Should Be Admitted

During the Government's case-in-chief at trial, the Government intends to offer evidence regarding Saaed Moslem's submission of a fraudulent loan application to Hudson Valley in or about December 2010 for Exclusive to participate in Hudson Valley's indirect lending program (the "2010 Hudson Valley Application"). In support of the 2010 Hudson Valley Application, Saaed Moslem (i) submitted the fraudulent Fourth 2009 Return that reflected substantially higher income than the tax return that Moslem actually filed with the IRS; and (ii) submitted an inflated net worth statement that overstated the value of his real estate assets, include the Pine Bush Property and the Middletown Property, in a substantially similar manner as he did during the charged bank fraud conspiracy.

The evidence concerning the 2010 Hudson Valley Application should be admitted. First, it is "inextricably intertwined" with and "necessary to complete the story" of the charged bank fraud conspiracy. *See Carboni*, 204 F.3d at 44. In particular, a key aspect of the charged bank fraud conspiracy involved the defendants' 2011 commercial mortgage application to Hudson Valley (the "2011 Hudson Valley Application"). As discussed above, Hudson Valley noticed discrepancies between the tax returns submitted for the 2010 Hudson Valley Application and the 2011 Hudson Valley Application. When Hudson Valley brought those discrepancies to Saaed Moslem's attention, Saaed Moslem provided a false cover story blaming an accountant for the fabricated Fourth 2009 Return submitted in support of the 2010 Hudson Valley Application. Accordingly, it is not possible to tell the complete story of the 2011 Hudson Valley Application without introducing evidence of the 2010 Hudson Valley Application. Moreover, the fraudulent net worth statement submitted by Saaed Moslem in support of the 2010 Hudson Valley Application was similar to the false information he provided to Hudson Valley and other lenders in furtherance of the charged bank fraud conspiracy.[9] As a result, evidence of the 2010 Hudson Valley Application reveals a pattern of conduct by Saaed Moslem of which the charged conspiracy formed a part. *See*, *e.g.*, *United States* v. *Mavashev*, 2012 WL 164075 (2d

---

[9] For example, the 2010 Hudson Valley Application stated that the Middletown Property was worth $390,000 and that the Pine Bush Property was worth $1 million, while the 2011 Hudson Valley Application valued those properties at $350,000 and $1.1 million, respectively.

Cir. 2012) (uncharged loan transactions properly admitted as direct evidence of charged offenses where evidence demonstrated that defendant treated all loan applications the same, rendering the uncharged transactions inextricably linked to the charged transactions by a pattern of criminal conduct); *United States* v. *Guyon*, 27 F.3d 723 (1st Cir. 1994) (uncharged loan evidence properly admitted where there was a "striking similarity between the evidence of charged and uncharged loans, and this evidence helped show that [defendant] was engaged in a widespread scheme to fraudulent apply for a number of loans, suing the same pattern of activity in each instance"); *cf. United States* v. *Klein*, 340 F.2d 547, 549 (2d Cir. 1965) (courts allow the introduction of evidence respecting similar offenses "based on the sound recognition that when there exists a pattern of misrepresentations, closely related in time and subject matter, it is reasonable to believe that they were not made innocently" (quotation marks and citation omitted)).

Evidence of the 2010 Hudson Valley Application is also properly admitted under Rule 404(b) because it is relevant to Saaed Moslem's knowledge and intent. Saaed Moslem argued in his motion to dismiss the original indictment in this case that CC-1 "affirmatively misled [the defendants] into approving financial statements" submitted to financial institutions and "mandated that any loan application . . . would be threaded with erroneous information." Accordingly, the Government anticipates that defendants' knowledge and intent will be centrally disputed issues in this case. Saaed Moslem's submission of the fraudulent 2010 Hudson Valley Application –

which did not involve CC-1 but contained similar false statements to the applications that the defendants submitted in support of the charged bank fraud conspiracy – is thus highly probative of Saaed Moslem's knowledge and intent. *See United States* v. *Mingo*, 2003 WL 22221358 (2d Cir. 2003) ("When knowledge and intent are disputed, a defendant's commission of similar bad acts is generally deemed probative."). Additionally, Saaed Moslem has previously claimed that the fabricated Fourth 2009 Return, which he never filed with the IRS but submitted to multiple financial institutions just months after filing the Third 2009 Return with the IRS, was a mistake attributable to an accountant. Saaed Moslem's submission of the Fourth 2009 Return to a lender (Bank of America) is the subject of Count Three of the Indictment. Accordingly, the fact that Saaed Moslem submitted the fabricated Fourth 2009 Return to lenders on more than one occasion, including as part of the 2010 Hudson Valley Application, is relevant to establishing his intent and the absence of mistake.

Finally, any incremental prejudice associated with evidence of the 2010 Hudson Valley Application would limited by virtue of its similar nature to evidence of the charged offenses, and would be outweighed by its probative value. *See United States* v. *Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (evidence that is neither "more sensational" nor "more disturbing" than the charged crimes will not be deemed unfairly prejudicial); *United States* v. *Mingo*, 2003 WL 22221358 (2d Cir. 2003) (evidence of uncharged forged checks properly admitted to show defendant knew she

was submitting falsified documents in connection with charged bank fraud scheme because "[w]hile the charged and uncharged acts must be closely parallel for the probative value of the latter on the issue of knowledge to outweigh any unfair prejudice, absolute synonymity is not required").

### b. Evidence of Saaed Moslem's 2006 Application for Homeowner's Insurance Should Be Admitted

During the Government's case-in-chief at trial, the Government intends to offer evidence concerning material misrepresentations that Saaed Moslem made in his application for a homeowner's insurance policy for the Middletown Property in 2006. In particular, Saaed Moslem falsely stated in his application for the policy that he, the owner, occupied the house on the Middletown Property, when in fact he had or was about to vacate the premises and began leasing it almost immediately after the application was submitted. As a result of this and other misrepresentations in Saaed Moslem's application, the insurance company denied Saaed Moslem's insurance claim for property damage after the house on the Middletown Property was destroyed in a fire in or about October 2006. In 2011, the U.S. District Court in this District granted the insurance company's motion for summary judgment to rescind Saaed Moslem's homeowner's insurance policy for the Middletown Property.

This evidence provides important background and helps to explain the motive for Saaed Moslem's fraudulent conduct in connection with his bankruptcy case, as charged in Count Six of the Indictment. In particular, Saaed Moslem admitted to CC-1 that the reason he filed for bankruptcy after the Court ruled in favor of the

insurance company was to "get rid of" the mortgage on the Middletown Property. In a consensually recorded conversation on or about March 30, 2015, Saaed Moslem directed CC-1 to take him "totally off" Exclusive in the 2014 tax return. When CC-1 asked the reason why, Saaed Moslem explained, in substance and in part, "[B]ecause I had to file for bankruptcy to get rid of a mortgage . . . .[I]t was the one that burnt out and eh, I lost it . . . . The insurance, they denied the claim because it was rented and I had a homeowner's policy. So I fought 'em in court for years and then I lost the battle, so I didn't wanna keep paying $2,500 a month for nothing." Indeed, at the time of the bankruptcy filing, Saaed Moslem's mortgage on the Middletown Property was substantially under water, with the outstanding debt substantially greater than the property's market value. Barely two weeks after the March 30, 2015 conversation cited above, Saaed Moslem, under oath at a hearing in the bankruptcy case, falsely concealed the transfer of his ownership stake in Exclusive and falsely denied his ownership of certain other assets, as identified in Count Six of the Indictment.

Accordingly, the evidence concerning Saaed Moslem's homeowner's insurance application is necessary for the jury (i) to understand the March 30, 2015 conversation, which is critical evidence of the offenses charged in Count Six, and (ii) to understand, more generally, his motive for the conduct charged in Count Six, including fraudulently transferring and concealing his ownership stake in Exclusive, as well as concealing other assets, during his bankruptcy case.

Evidence of the homeowner's insurance application and the insurance company's denial of Saaed Moslem's property damage claim for the Middletown Property is also relevant to demonstrating his knowledge and intent with respect to the charged bank fraud conspiracy and false statements to lenders because those charges involve falsely inflated net worth statements as result of, among other things, Saaed Moslem's knowing overstatement of the value of the Middletown Property. That is, Saaed Moslem's knowledge that the house on the Middletown Property was destroyed and that he had made false statements in his insurance application resulting in denial of his insurance claim and rescission of the policy are relevant to showing that he knew the falsity of his statements to lenders that, in essence, the property was worth substantially more after it burned down than its original purchase price.

Any prejudice associated with the evidence of the Saaed Moslem's false statements in his insurance application is limited because of its similar nature to the conduct charged in the Indictment, which already includes false statements in loan applications and other documents. *See*, *e.g.*, *United States* v. *Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992) (in narcotics case, evidence of prior narcotics transactions admitted where it "did not involve conduct any more sensational or disturbing than the crimes which [the defendants] were charged"). Any prejudice is outweighed by the probative value of the evidence with respect to providing background, and showing motive, knowledge, and intent with respect to the charged offenses. Additionally, the Court can guard against any potential prejudice by providing the

jury with limiting instructions.  *See Untied States* v. *Levy*, 731 F.2d 997, 1002 (2d Cir. 1984).

### c. Evidence of Uncharged Loans During the Bank Fraud Conspiracy Should Be Admitted

The Government intends to offer evidence at trial regarding the defendants' efforts to misrepresent financial information during the period of the charged bank fraud conspiracy in connection with loan applications that are not charged as substantive offenses or expressly identified in the bank fraud conspiracy count of the Indictment. For example, during the charged bank fraud conspiracy, Mehdi Moslem directed CC-1, in substance and in part, to change information in draft tax returns for two entities that he owned – Accel Motors, Inc. and Fulton Street 1111, Inc. – in order to make such information appear more attractive to potential lenders.  Such conduct fits the pattern of the charged bank fraud conspiracy and should be admissible as direct evidence of Count Two of the Indictment.  *See*, *e.g.*, *Carboni*, 204 F.3d at 44 (affirming admissibility of uncharged acts of falsification of business inventory, which occurred at or around the same time as the charged false statements); *United States* v. *Mavashev*, 2012 WL 164075 (2d Cir. 2012) (uncharged loan transactions properly admitted as direct evidence of charged offenses where evidence demonstrated that defendant treated all loan applications the same).

Alternatively, such evidence should be admissible under Rule 404(b) to prove intent.[10] *Cf. United States* v. *Klein*, 340 F.2d 547, 549 (2d Cir. 1965) (courts allow the introduction of evidence respecting similar offenses "based on the sound recognition that when there exists a pattern of misrepresentations, closely related in time and subject matter, it is reasonable to believe that they were not made innocently.")

### d.  Evidence of the Defendants' State Tax Returns Should Be Admitted

The Government may introduce evidence that the defendants underreported their income in New York State tax returns during the period of the charged conspiracy to defraud the IRS.  Such evidence is inextricably intertwined with the charged conspiracy because the defendants' state tax returns were, for at least some tax years, designed to be consistent with, and thus conceal the falsity of, the federal tax returns that are the subject of Count One.  *See*, *e.g.*, *United States* v. *Peck*, 2003 WL 1465563 (6th Cir. 2003) (state tax returns properly admitted in prosecution for federal tax scheme).

### e.  Evidence of the Defendants' Failure to File Tax Returns Should Be Admitted

The Government intends to offer evidence that the defendants failed to file tax returns for themselves and certain entities that they owned and controlled for certain

---

[10] The Government also intends to offer evidence of the false statements to lenders charged in Counts Three and Four of the Indictment as evidence of intent with respect to the bank fraud conspiracy charged in Count Two.

tax years prior to and during the charged conspiracy to defraud the IRS, including federal tax returns for the following individuals/entities and tax years: Saaed Moslem for 2017; Exclusive Auto Group Ltd. for 2003-2017; Accel Motors, Inc. for 2005, 2007-2009, 2012-2015, and 2017; Fulton Street 11114, Inc. for 2007-2009, 2014, and 2015; Arimes Estates Ltd. for 2010-2017; and Quality Homes of Hudson Valley LLC for 2011-2017.

Evidence of the failure to file tax returns during the life of a charged conspiracy to the defraud the IRS indicates that the defendants were "interested in keeping money out of the right hands of the IRS during that time" and should be admitted as direct evidence of the conspiracy. *See*, e.g., *United States v. Crim*, 561 F. Supp. 2d 530 (E.D. Pa. 2008) (noting absence of any authority for proposition that admitting evidence of failure to file during the life of a Klein conspiracy is an abuse of discretion). Evidence of the defendants' filing history for themselves and their corporations is particularly relevant to the charged conspiracy given the facts here. For example, the Government expects that the evidence at trial will show that Saaed Moslem received substantial income from Exclusive in 2017 that he did not report to the IRS because he did not file a 2017 Form 1040. Additionally, the evidence will show that Mehdi Moslem directed CC-1 not to file tax returns for Accel Motors, Inc. because he did not want to have to pay the associated taxes. The failure to file tax returns for Exclusive Auto Group is similarly instructive because the defendants suggested to the Government (through their prior counsel) that they may argue the ending inventory

that is the subject of the charged conspiracy to defraud the IRS belonged to Exclusive Auto Group, as opposed to Exclusive Motor Sports.

Evidence of a defendant's failure to file tax returns for periods prior to the charged conduct is also properly admitted in federal tax prosecutions under Rule 404(b) to demonstrate intent. *See, e.g.*, *United States* v. *Jenkins*, 871 F.2d 598 (6th Cir. 1989) (in prosecution for conspiracy to defraud the IRS, no error in admission of evidence concerning defendant's failure in prior years to file income tax returns); *United States v. Scali*, 820 Fed. Appx. 23126 (2d Cir 2020) (admission of taxpaying record properly admitted under Rule 404(b) to show intent to evade taxes); *United States v. Bok*, 156 F.3d 157, 166 (2d Cir. 1998) (defendant's "failure to file state or federal returns for either himself or his corporations . . . is indicative of an intent to evade the tax system."). Furthermore, the defendants' failure to file tax returns for certain years is no more sensational or inflammatory than the charged conduct. Evidence of it will be simple, straightforward, and brief, and it will be highly probative of the defendants' knowledge and intent.

### f. Evidence of Saaed Moslem's 2018 Bankruptcy Case Should Be Admitted

In or about August 2018, approximately three years after the resolution of the chapter 7 bankruptcy case that is the subject of Count Six of the Indictment, Saaed Moslem filed for chapter 13 bankruptcy (the "Second Bankruptcy Case"). From on or about September 27, 2018 through on or about October 2, 2018, Saaed Moslem asked CC-1, in substance and in part, to prepare a 2017 personal tax return showing

an income of only approximately $15,000 in order for Saaed Moslem to submit it to the bankruptcy court in support of the information that Saaed Moslem put on his petition in the Second Bankruptcy Case.

This evidence relating to the Second Bankruptcy Case should be admitted as direct evidence of the charged conspiracy to defraud the IRS because it is inextricably intertwined with such conduct. *Carboni*, 204 F.3d at 44. The Government expects the evidence at trial to show that Saaed Moslem received substantially more compensation in 2017 than the $15,000 that he asked CC-1 to report on his 2017 Form 1040. After CC-1 declined to prepare Saaed Moslem's 2017 Form 1040, Saaed Moslem chose not to file a 2017 tax return with the IRS. Accordingly, the communications between Saaed Moslem and CC-1 relating to the Second Bankruptcy Case are necessary to tell the story of Saaed Moslem's conduct in furtherance of the charged conspiracy to defraud the IRS.

Additionally, this evidence is admissible under Rule 404(b) to show motive for the charged conspiracy to defraud the IRS and, more broadly, to show the nature of the relationship between Saaed Moslem and CC-1. Based on the defendants' motion to dismiss the original indictment, the Government anticipates that the defendants will seek to portray the relationship with CC-1 as one in which they deferred to CC-1. Accordingly, evidence of the nature of the relationship between Saaed Moslem and CC-1, as reflected in their conversations relating the Second Bankruptcy Case is highly probative. Although the evidence relation to the Second Bankruptcy Case took

place after the 2015 bankruptcy case (albeit during the charged conspiracy to defraud the IRS and bank fraud conspiracy), it is "sufficiently similar to the [charged] conduct at issue" to be admissible.  *See United States v. Curley*, 639 F.3d 50 (2d Cir. 2011); *United States* v. *Nastri*, 2018 WL 4568807 D. Vt. 2018), adopted, 2018 WL 644688 (D. Vt. 2018) (evidence of subsequent bad acts admissible to demonstrate the "nature of the connection" between conspirators, especially where defense strategy focused on the creditability of cooperating witnesses).  Finally, the evidence relating to the Second Bankruptcy Case is not unfairly prejudicial as it regards conduct equivalent to the charged offenses.

### g.    Evidence of Saaed Moslem's Participation in Fraudulent Car Loan Applications Should be Admitted

The Government intends to offer testimony that, in or about 2015-2016, a customer ("Customer-2") purchased a car from Exclusive.  Saaed Moslem told Customer-2 how to make the application look more appealing to the bank in order to secure the loan. In particular, Saaed Moslem told Customer-2 to inflate her and her husband's assets and leave off what they pay for rent in the application.  Saaed Moslem told Customer-2, in substance and in part, that showing more disposable income to the bank would make the loan application more appealing.

This evidence should be admitted as directed evidence of conduct in furtherance of the charged bank fraud conspiracy, pursuant to which the defendants are alleged to have fraudulently sought and obtained loans for Exclusive and Exclusive's customers. Additionally, it should be admitted under Rule 404(b) to show intent and absence of

mistake with respect to the bank fraud charged in Count Five of the Indictment given the similar nature of the conduct. In particular, both this conduct and the conduct charged in Count Five involve Saaed Moslem's participation in the provision of false information relating to his customers' financial condition to prospective lenders in order to boost their prospects of obtaining a car loan, and thereby facilitate Exclusive's sales. Given the similar nature of the evidence at issue to the charged conduct, any prejudice is limited and is outweighed by the probative value.

For the reasons explained above, the Court should admit proof of the aforementioned acts of the defendants under Rule 404(b).

### B. The Court Should Preclude the Defendants' Alleged Advice-of-Accountant Defense

The Government moves *in limine* to preclude the defendants from offering an advice-of-accountant defense regarding CC-1's preparation of the defendants' tax returns. The defendants have previously raised these arguments in their pretrial filings. *See* Mot. at 4 (Dkt. No. 36-1) ("There can be no dispute that Defendants relied upon CC-1 for financial advice and his professional guidance"); & at 6 ("The Government knew that the Defendants were financially unsophisticated and relied upon CC-1 in connection with a broad array of business activities."). As explained below, the defendants clearly have no basis in the record to raise this defense.

For the defendants to argue—and ultimately receive a jury instruction on—the defense that they relied on the advice of their accountant, they must offer some

evidence that: (i) they sought the advice of an accountant whom they considered competent; (ii) they made a full and accurate report to that accountant of all the material facts available to them; (iii) they acted strictly in accordance with the accountant's advice; and (iv) without having any reasonable basis to believe that the advice was incorrect. Sand, *Modern Federal Jury Instructions*, 59-9. The defendants cannot assert such a defense "unless there are sufficient facts in the record to support the defense." *United States v. Quinones*, 417 F. App'x 65, 67 (2d Cir. 2011) (summary order) (affirming denial of instruction and order precluding defense from arguing advice of counsel defense in summation when defendants did not show required factual predicate). Absent that showing, any evidence suggesting a reliance-on-accountant defense would mislead the jury and waste time.

It is highly unlikely that the defendants could make the sufficient showing to warrant such a charge. *See United States v. Evangelista*, 122 F.3d 112, 117 (2d Cir. 1997) (finding "no basis in the evidence for the [defendants'] reliance-on-advice [of accountant] defense"); *United States v. Scully*, 877 F.3d 464, 476 (2d Cir. 2017) (explaining "defendants are entitled to an advice-of-counsel instruction only if there are sufficient facts in the record to support the defense").

The evidence will show that the defendants and CC-1 acted together in knowingly providing false information to the IRS. The defendants therefore could not have reasonably believed that CC-1 had prepared proper and accurate tax returns.

The Court should reject any reliance-on-accountant defense argument because it presumes the existence of good faith solicitation that is not supported by the record. *Evangelista*, 122 F.3d at 117 ("Reliance on advice, offered as a defense, 'presupposes the defendant's solicitation of advice in good faith.'") (internal citation omitted). The evidence at trial will show that the defendants, who were in the best position to know the financial workings of Exclusive, provided false information relating to Exclusive's books and records and directed CC-1 to use that false information in preparing tax returns for Exclusive. Moreover, as the Government described in prior filings, multiple consensually recorded conversations between CC-1 and the defendants will further demonstrate the ongoing fraud in preparing and submitting these tax returns. *See* Dkt. No. 44 at 11-13. As a result of the defendants and CC-1 acting together in the defendants' criminal conduct, Saaed Moslem reported approximately $15,570 of income in tax year 2015 and $15,675 in tax year 2016 despite receiving hundreds of thousands of dollars more in compensation (either directly or in the form of the payment of personal expenses). No reasonable person could accept in good faith any advice from a tax preparer to report such a small fraction of their income.

Accordingly, the Government respectfully requests that the Court preclude evidence suggesting a reliance-on-accountant defense.

### C. The Court Should Exclude Evidence of Unclaimed Expenses of the Defendants

The Government anticipates based on the defendants' arguments in their motion to dismiss the original indictment that they may seek to introduce evidence of

unclaimed business expenses. In particular, the defendants argued that their tax returns "omitted hundreds of thousands of dollars of legitimate business expenses." (Dkt. 36-2 at ¶ 12). Pursuant to Federal Rules of Evidence 401 and 403, the Court should exclude such evidence because it is not relevant at least where, as here, there is no evidence that the defendants were contemporaneously aware of their entitlement to claim such expenses and made a conscious decision not to do so. Additionally, the risk of confusing the jury with respect to evidence of the unclaimed expenses substantially outweighs any probative value of such evidence for the reasons set forth below.

Even assuming, *arguendo*, that the unclaimed expenses were to entirely negate actual loss to the IRS as a result of the defendants' conduct, it is irrelevant because loss is not an element of the charged conspiracy. Rather, it is the unlawful agreement that constitutes the crime charged in Count One, and it is not necessary to show that the scheme to defraud was a success or that the federal government was actually harmed. *See United States* v. *Rosengarten*, 857 F.2d 76, 79 (2d Cir. 1988); *United States* v. *Everett*, 692 F.2d 596, 599 (9th Cir. 1982); *United States* v. *Pintar*, 630 F.2d 1270, 1277-78 (8th Cir. 1980). Essentially, all the Government must show is that the defendants agreed to deceptively impede the functions of the IRS, regardless of whether there was "direct tax evasion" of an actual tax due and owing. *See United States* v. *Klein*, 247 F.3d 908 (2d Cir. 1957) (conspiracy to defraud the United States "not only includes the cheating of the government out of property or money, but also

means to interfere with or obstruct one of its lawful government functions by deceit, craft or trickery, or at least by means that are dishonest"); *see also Hammerschmidt* v. *United States*, 265 U.S. 182, 188 (1924); *United States* v. *Nerseian*, 824 F.2d 1294, 1313 (2d Cir. 1987); *United States* v. *Jenkins*, 871 F.2d 598, 603 (6th Cir. 1989).

Moreover, "a subjective aim to reduce tax liability" is not even required to convict a defendant of a conspiracy to defraud the IRS. *United States* v. *Goldberg*, 105 F.3d 770, 773 (1st Cir. 1997) (conspirators' purpose to interfere with functions of the IRS can be inferred from filing of false tax documents, even assuming no subjective desire to reduce their tax liability).

Accordingly, any conceivable relevance of the unclaimed expenses hinges on evidence that the defendants made a conscious decision to disclaim them (for example, in order to partially or fully offset the other ways in which they falsely deflated Exclusive's profits and their personal incomes). Where, as here, no such evidence exists, evidence of the unclaimed expenses presents too substantial a risk of confusing the jury regarding the issues in the case and wasting time on a "mini-trial" as to the legitimacy of the alleged unclaimed expenses. Therefore, the Court should exclude evidence of the unclaimed expenses.

### D. The Court Should Exclude Evidence Regarding Any Alleged Lack of Loss on the Fraudulent Loans

An integral part of the defendants' fraudulent conduct was the submission of multiple loan applications with materially false information regarding their assets and liabilities. These crimes, namely, conspiracy to commit bank fraud (Count Two),

false statements to lenders (Counts Three and Four), and bank fraud (Count Five), were completed once the defendants knowingly submitted materially false information to the lenders as part of their scheme to defraud, or agreed to do so in the case of the conspiracy charged in Count Two. Accordingly, any evidence regarding the lenders' lack of actual losses, or any attempts to pay back the loans, is irrelevant and would ultimately confuse the issues before the jury. As such, the Court should preclude any evidence from the defendants' regarding the lenders' lack of loss or any repayment attempts.

The Government will introduce evidence showing multiple misrepresentations made to banks and lenders in connection with the defendants' fraudulent conduct. Among other things, the defendants submitted multiple loan applications for Exclusive that significantly overstated their net worth by (i) inflating the market value of their real estate holdings; and (ii) omitting tax liabilities based on their understatement of income on the fraudulent tax returns at issue in Count One.

For each of the statutes charged in Counts Two through Five, the issue of actual loss to the lenders is immaterial. The essential elements of bank fraud require that a defendant knowingly execute, or attempt to execute, a scheme or artifice either (i) to defraud a financial institution, or (ii) to obtain bank property by means of false or fraudulent pretenses, representations, or promises. 18 U.S.C. § 1344; *see also Loughrin v. United States*, 573 U.S. 351, 355-56 (2014). Although the Government must prove the defendants' fraudulent intent, it is not required to show that the

financial institutions were actually defrauded. *See United States v. Wallach*, 935 F.2d 445, 461 (2d Cir. 1991) (explaining, in wire fraud context, that "[t]he government need only show that the defendants contemplated some actual harm or injury"); *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (explaining, in mail fraud context, that "the government is not required to prove that an intended victim was actually defrauded to establish a violation by the defendants," and that "[n]o actual pecuniary injury, therefore, need result to the victim of the fraud").

Against that backdrop, any evidence sought by the defendants at trial to show any lack of loss or injury to the banks and lending institutions is irrelevant to the issue of guilt. For example, in *United States v. Sidona*, 636 F.2d 792 (2d Cir. 1980), the defendant was charged with (among other things) wire fraud arising out of his scheme to obtain and misapply $15 million in funds from a bank through fraud. The district court precluded evidence that the defendant later—after the bank became insolvent —caused the funds to be repaid in part because this proof was irrelevant to whether the defendant was guilty of the charged wire fraud. *Id*. at 800. Relying on Rule 403, the Second Circuit affirmed, explaining that "[t]he only probative value associated with the repayment" would "either be to show that [the victim bank] suffered no loss or that [at the time of the fraud] Sindona did not intend to misapply [the victim bank's] funds." *Id*. But "loss to the victim need not be shown in order to prove a violation" of the wire fraud statute, and the repayment was irrelevant to the defendant's intent at the time of the fraud because the "offense occurred and was

complete when the misapplication took place." *Id.* (internal quotation marks and citation omitted). Therefore, because "[w]hat might have later happened as to repayment is not material and could not be a defense" to the charged wire fraud offense, the Second Circuit found that the district court properly precluded evidence of the repayment of proceeds of the fraud. *Id.* (internal quotation marks and citations omitted).

So too here. Each of the statutes charged in Counts Two through Five focus essentially on the issue of fraudulent intent in submitting materially false information to defraud various lenders to further the defendants' business interests in Exclusive. Whether the loans were actually approved or repaid is irrelevant. Any evidence of whether the lenders were actually deprived of funds or suffered a loss would, in turn, cause substantial risk of confusing the jury on issues that are ultimately irrelevant. *See United States v. Karro*, 257 F.3d 112, 118 (2d Cir. 2001) (explaining, in mail fraud case, that "the defendant's contention that she lacked the intent to fail to repay the money she charged on the fraudulently-obtained credit cards is irrelevant to her guilt"); *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998) ("[W]here a defendant deliberately supplies false information to obtain a bank loan, but plans to pay back the loan and therefore believes that no harm will 'ultimately' accrue to the bank, the defendant's good-faith intention to pay back the loan is no defense because he intended to inflict a genuine harm upon the bank[.]").

Accordingly, the Government respectfully requests that the Court preclude evidence from the defendants concerning lack of loss or repayment of loans in connection with the fraudulent conduct charged in Counts Two through Five.

### E. The Court Should Admit Statements by the Defendants' Agents

The Government expects to introduce at trial statements by the defendants' agents, including statements by Saaed Moslem's bankruptcy attorney ("Attorney-1") to the Office of the United States Trustee ("UST").

For example, an or about February 5, 2015, the UST sent an email to Attorney-1 inquiring, in substance and in part, why Saaed Moslem listed no current income in his bankruptcy petition. On or about February 13, 2015, Attorney-1 replied to the UST as follows: "[Saaed Moslem] is exclusively on commission, based upon the information he provided to us and has had no sales in the past six months." On or about April 3, 2015, Attorney-1 further replied: "[Saaed Moslem's] current monthly income is 0 . . . because before where he was on salary, he is now strictly on commission and nothing has been sold in the past six months." Attorney-1's statements were false or misleading because, as the evidence at trial will show, Saaed Moslem received compensation during the period immediately preceding the commencement of and during the pendency of his bankruptcy case. As such, they are relevant to the offenses charged in Count Six of the Indictment.

Rule 801(d)(2)(D) permits the introduction into evidence of a statement by a party's agent "concerning a matter within the scope of the agency . . . made during the

existence of the relationship." *United States* v. *Pilarinos*, 864 F.2d 253, 257 (2d Cir. 1988). The Advisory Committee Notes to Rule 801(d) specifically note that admissions by a party and his agents may be received into evidence without many of the technical prerequisites of other evidentiary rules — such as, for example, trustworthiness or personal knowledge. *See Pappas v. Middle Earth Condominium Assoc.*, 963 F.2d 534, 537 (2d Cir. 1992). Accordingly, "admissibility under this rule should be granted freely." *Id.*

Here, as Attorney-1 represented Saaed Moslem in connection with his bankruptcy case and the statements at issue were clearly within the scope of that representation, they should be admitted as statements of Saaed Moslem's agent under Rule 801(d)(2)(D).

### F. The Court Should Exclude After-the-Fact Appraisals as Evidence of State of Mind

The Government expects, based on information provided by prior defense counsel, that the defendants may seek to offer evidence of an appraisal performed for Noah Bank in or about September 2018 of the property on Route 302 in Central Valley, New York that is the site of Exclusive's dealership (the "Exclusive Property"). The appraisal valued the Exclusive Property at approximately $2.5 million. While this appraisal may be relevant to showing the value of the Exclusive Property during the period of the charged conspiracy, it should not be admitted to show the defendants' state of mind in connection with any loan applications that predated the defendants' receipt of the appraisal, including their loan application to Salisbury Bank in or about

February 2017.  *See United States* v. *Kail*, 804 F.2d 441, 446 (8th Cir. 1986) (affirming exclusion of administrative law judge opinion intended to support defendant's claim of good faith as irrelevant and hearsay where "there [was] no evidence presented that [the defendant] was in any way aware of the administrative law judge's decision until the time of his own trial."); *cf. Farahmand* v. *Cohen*, 1999 U.S. Dist. LEXIS 10742 at *11-12 (E.D. Pa. July 15, 1999) ("after-the-fact evidence is often irrelevant to a person's intent, knowledge or state of mind at an earlier time").

### G. The Court Should Admit Defendants' Statements Regarding the Value of their Real Estate Assets

Prior to and during the period of the charged bank fraud conspiracy, the defendants made a number of conflicting statements regarding the value of real estate assets that they falsely inflated in furtherance of the charged bank fraud conspiracy, and in connection with the loan applications charged in Counts Three and Four.  For example, as discussed above, from 2013 through 2015, Saaed Moslem made statements acknowledging that the value of the Pine Bush Property and the Middletown Property were substantially lower than the he falsely claimed to lenders in 2010 through 2013.  Additionally, from 2010 through 2012, Mehdi Moslem made statements acknowledging that the value of the Central Valley Property was substantially lower than he falsely claimed to lenders in 2011.

These admissions are probative of the defendants' knowledge at the time of their false statements.  *See United States* v. *Nix*, 548 F.2d 1159 1160 (5th Cir. 1977) (knowledge defendant claimed he acquired after his crime was admissible for the

purpose of proving defendant's knowledge at the time of the crime). Under Federal Rule of Evidence 801(d)(2)(A), the statements are admissible as party admissions against the party that made the relevant statement. Additionally, in some instances, even the admission statements were made in furtherance of the charged bank fraud conspiracy, for example as part of other fraudulent loan applications, and accordingly such statements should be admitted against both defendants under Federal Rule of Evidence 801(d)(2)(E).

### H. The Defendants Should Be Required to Produce Reciprocal Discovery

Despite its requests, the Government has received only limited reciprocal discovery from either defendant to date. Rule 16(b) clearly requires the defense to produce reciprocal discovery. *E.g.*, *United States v. Cohen*, 1985 WL 4851 at *2 (S.D.N.Y. 1985) (ordering defendant to produce reciprocal discovery over defendant's assertion that discovery should be unilateral). Accordingly, the Government respectfully requests that the Court direct the defendants to comply with their discovery obligations.

Among other things, the defendants should produce all documents and other tangible objects in either defendants' possession, custody or control that either defendant intends to introduce as evidence in his case in chief at trial. Fed. R. Crim. P. 16(b)(1)(A). The defendants' productions should include documents they intend to introduce through any witness—including witnesses called by the Government—for any purpose other than impeaching that witness. Similarly, the defendants' productions should also include all documents and other materials they intend to use

40

in their case in chief, including documents and other materials already in the Government's possession. Such production should include the documents and materials that the defendants intend to rely on in formulating any advice-of-accountant defense that they have already raised in prior pretrial filings, and as described above.

The need for the defendants to disclose *all* documents and materials they intend to use in their cases in chief, other than for impeachment, is particularly compelling in a complex, document-laden case such as this one in order to avoid surprise and gamesmanship. *See United States v. Holden*, 2015 WL 1514569 at *6 (D. Ore. 2015) ("The surprise introduction in Defendant's case-in-chief of exhibits drawn from the voluminous documents provided by the government would likely cause unwarranted and preventable delays in trial").

Accordingly, the Government respectfully requests that the Court direct that both defendants comply with Rule 16(b)(1)(A) immediately to prevent delays during the trial and to permit the Government to make fair use of the materials. The defendants should be required to produce all documents and materials they intend to use for purposes other than impeachment and without regard to their source.

Additionally, the Government also moves for the production of any results or reports of physical or mental examinations and of scientific tests or experiments made in connection with this case, or copies thereof, which are in either defendant's possession or control, and which either defendant intends to introduce as evidence in

his case in chief or which were prepared by a witness whom either defendant intends to call at trial. *See* Fed. R. Crim. P. 16(b)(1)(B). Both defendants sought production of these materials from the Government, thereby triggering their reciprocal discovery obligation once the Government has substantially complied with its corresponding obligation, which it has.

Finally, the Government requests that the defendants allow inspection and copying of all materials they have received in response to subpoenas they have served pursuant to Fed.R.Crim.P. 17.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court grant the Government's motions *in limine*.

Dated:  White Plains, New York
    April 1, 2021

       Respectfully submitted,

       AUDREY STRAUSS
       United States Attorney
       Southern District of New York


   by:  _____/s/_____
       Daniel Loss
       Nicholas S. Bradley
       James McMahon
       Assistant United States Attorneys
       (212) 637-6527 / (914) 993-1962 / -1936