
# PRESTON M. FARO & ASSOCIATES INC.
## FORENSIC ACCOUNTING
144 OGDEN AVENUE
DOBBS FERRY, NY 10522
TEL (914) 693-0348     CELL (914) 393-7241
E-mail PBOFARO7@aol.com

The Honorable District Judge Cathy Seibel
United States District Court
Southern District of New York

My name is Preston Bo Faro. I am the President of Preston M Faro & Associates. I am a Forensic Accountant who was contacted by the Moslem's Defense Attorney's, Richard Willstatter Esq. (defense attorney for Medhi Moslem) and Benjamin Ostrer Esq. (defense attorney for Saaed Moslem) to lend my forensic accounting expertise in the defense of defendants Saaed & Medhi Moslem in a case which was under criminal investigation in the U.S. Attorney's Office, Southern District of New York. I have worked with Richard Willstatter on many criminal and civil cases over the past 12 years. I am a retired Special Agent (Criminal Investigation Division) of the Internal Revenue Service. I served as a Special Agent for almost 26 years in the Manhattan District until 12/31/98. I immediately began working as a Forensic Accountant after retirement and started my own firm (Preston M Faro & Associates Inc.) a few years later providing the same forensic accounting skills.

I have been requested by the Moslem's to give an affidavit detailing the forensic accounting work that I performed during this investigation. In addition, I was asked to include any meetings I had at the U.S. Attorney's Office as well as any meeting that I had with IRS Special Agent Brian Carcione to discuss the schedules that I had created for the defense.

After several meetings with Willstatter and Ostrer including meetings with both Medhi & Saaed Moslem, I started my review of the 2010 Exclusive Motor Sports LLC 1065 Federal Tax Return which included the analysis of the 2010 bank accounts for that business which Medhi and Saaed Moslem owned in different percentages over the years. I had debriefed Saaed Moslem who said that he was sure that the tax return prepared by their accountant, Strauhs had to be completely inaccurate as he did not feel that the company made any money and in addition, the amounts of gross receipts and total withdrawal expenses could not have been correct. I was told by Willstatter and Ostrer that a meeting was coming up in the near future at the U.S. Attorney's Office in NYC. We discussed that I would start with the review of the 2010 tax return and bank accounts to determine if there was any unreported income which the Gov't had discussed with Willstatter & Ostrer as a possible charge that they were looking at.

I then conducted an analysis of the Exclusive Motor Sports LLC bank accounts for the year 2010 whereby I listed every single deposit as a gross receipt and every single payment by check or

1

wire as an expense. The schedules I created also had columns for business expenses, personal expenses, payroll, loan repayments, rent and payments to the wholesaler car dealers. This method of calculating the income and expenses was done in order to get a quick analysis and comparison of the tax returns and bank accounts to see if there were any glaring discrepancies before we had the meeting at the U.S. Attorney's Office. The analysis was not done as if I was preparing amended returns. I am not a tax preparer and I did my review and analysis to determine whether this tax return appeared to be filed with the correct amounts. My analysis was simply to list all deposits as income and all checks and wires as business expenses. I did not compute depreciation for my review. I also listed loans made to the corporation as income and interest repayments made to the people who loaned money to the corporation as expenses. A tax preparer would treat those payments differently and would be included on a balance sheet. These amounts were relatively small for the years I reviewed and would not have really affected my analysis

My analysis of the 2010 year showed that the 2010 fed tax return for Exclusive Motor Sports filed by Strauhs listed Gross Receipts of the company as $1,733,299. It also listed Total Withdrawal Expenses as $1,572,581. It showed 2010 Ordinary Business Income as $160,718. As stated above, I had started this analysis after debriefing Saaed Moslem who thought that these figures on the tax return looked very inaccurate. My bank account analysis showed that in 2010, Gross Receipts into the business account were $3,609,634 and Total Withdrawal Expenses which I described above were $3,655,175. My schedule also showed that from the $3,655,175 expenses, that this included $192,960 in personal expenses that were shared by Medhi & Saaed Moslem. The personal tax returns of Medhi & Saaed Moslem showed that they reported a total of $168,443 between them that year. As I stated earlier, I did not prepare an amended tax return but rather did a comparison analysis to see if there were any discrepancies. The review reflected that the 2010 tax return prepared and filed by Strauhs for Exclusive Motor Sports was in fact completely inaccurate. The Gross Receipts amounts were underreported on the tax return by approx. $1,876,355. The Total Withdrawal Expenses amounts were underreported by approx. $2,082594. The bottom line is that the figures on this tax return filed were totally false.

On 2/14/20, I met with Willstatter at his office in White Plains and shared with him all of my findings for the year 2010. On 2/20/20, I went with defense attorney's Willstatter & Ostrer to give a presentation on my analysis of the 2010 huge tax discrepancies on the Fed tax returns filed by Strauhs. We met with AUSA Loss and one other AUSA at this meeting. I showed AUSA Loss my schedules with findings which showed that the Corp tax return filed by Strauhs for 2010 for Exclusive had been prepared and filed with numbers that had to be completely incorrect. The business bank account analysis did not support the figures notated on the tax return. The numbers did not match up with the business bank accounts and that the discrepancies were huge. My analysis also showed that it appeared that the correct amounts if filed correctly would not support a tax charge of unreported income for that year. We then discussed how I arrived at my figures on the schedules and AUSA Loss asked me if I had a

2

memory stick showing all of my schedules and findings. I replied yes and handed him the memory Stick and he said he would share these findings with his IRS and FBI agents to review and we ended that meeting. Approximately 2 weeks later, I received a call from Willstatter saying that he had spoken to AUSA Loss and his accountants with the IRS & FBI had reviewed my schedules and that their investigation showed that they agreed with the discrepancies that I had listed and discussed at out previous meeting. AUSA Loss also asked if I could do the same analysis for 2011, 2012 & 2013 as I did for 2010. Subsequently I used the same method to compile the same schedules for 2011, 2012 & 2013 which compared the Corp Fed tax returns with the Corp bank accounts for the additional years. I did not find the huge discrepancy on the gross receipts & total withdrawal expenses that I found in 2010 but the analysis portrayed on my schedules appeared to fail to support any criminal IRS charges showing unreported income. On 6/18/20, I participated in a conference call with defense attorney's Willstatter, Ostrer, AUSA Loss and also one other AUSA. At that time, I had already finished the schedules for 2011 & 2012 and had shared them with Mr. Willstatter who also shared them with AUSA Loss. During the conference we discussed the schedules and I said that I was working on the 2013 analysis. It was agreed that after finishing the 2013 analysis, I would meet with IRS Special Agent Brian Carcione to go over all of the expense checks and wires to see which were business related and which were personal expenses.

On 10/20/21, I went to the IRS office in Staten Island and sat down with Special Agent Carcione and started to go over all of my schedules that listed all of the corporate checks and wires from my analysis of the 2010-2013 corporate bank accounts. We listed all business expenses and personal expenses. At the end of the meeting, Carcione and I listed all expenses that we weren't sure whether they were business or personal and I said I would check and we could review them in the near future. On 11/19/21, I called Carcione and we continued the review of expenses as to business or personal. On 12/1/20, I called Carcione and spoke briefly as we finished a few more expenses that I had reviewed concerning business or personal expenses. Subsequently to these meetings, I received a call from Willstatter saying that he had spoken to AUSA Loss and was told that the government was not going to charge the Moslems with any charge of unreported income for the years 2010-2013 but was going ahead with problems with the inventory amounts listed on the tax returns as well as other Conspiracy counts. The Conspiracy counts dealt with bank loans for the Moslems. I did not work on any of these bank charges involved with the Conspiracy charges.

During the time that I was working on all of the 2010-2013 tax returns and bank records, I explained to both Saaed and Medhi Moslem that I was a former IRS Special Agent of the criminal Investigation Division. My expertise did not include preparing tax returns. I also discussed the 2010-2013 schedules that I prepared after analyzing the corporate Federal Tax Returns that his preparer, Strauhs had prepared and my review of the corporate bank accounts. I explained that my review did not consist of amending the original tax returns but rather was to make a comparison of those tax returns filed and the bank accounts to get a view of whether the amounts listed on the tax returns were correct and approximately how much income

3

should have been shown by the corporation and by the Moslems. At this point the Moslems hired Yuriy Payziyev whom I was told was a former IRS Audit Agent who went into business for himself as a tax preparer. Payziyev was going to help the Moslems file additional tax returns for the Moslems and to go through all of the past tax returns in order to see how much money the corporation and the Moslems really made by reviewing all records and preparing new returns to determine the correct amounts. I spoke to Payziyev several times but did not work with him on this process. He said he was reviewing all of the tax returns going back to 2009 as well as the 2010-2013 tax returns that I reviewed and was also looking at various tax returns from 2014 to the present.

In February of 2021, I had a conference call with defense attorney's Zintrater, Agnifilo & Memouna who were the new defense attorney's that would defend the Moslems during the upcoming trial. I subsequently met with them and had several phone calls and reviewed all of the work that I had done for the Moslems previously. I discussed the 2010-2013 schedules and all of the work I had done under defense attorney's Willstatter & Ostrer. I was also present at the trial for most of the days and took notes and tried to be of some aid in the defense of the Moslems.

As stated at the beginning of this affidavit, I was asked by the Moslem's to detail the work that I performed as a forensic accountant helping to defend the Moslem's under the direction of all of the defense attorney's from the beginning of my assignment to the end of the trial. This Affidavit was prepared by me without any help and I believe is true as to all of the facts stated within.

*[signature]*
Preston Bo Faro

Preston M Faro & Associates Inc.
Forensic Accounting

LIM KIM A. *[signature]*
Notary Public, State of New York
No. 01L16144154
Qualified in Westchester County
Commission Expires Apr. 24, 20_26_

May 05, 2022

4